## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

JUL 2 5 2018

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | |
| | CASE NO. *TMD* 18-1792 |
| 177 WEST HAMBURG STREET BALTIMORE, MARYLAND 21230 | |
| | CASE NO. *TMD* 18-1793 |
| 1996 SILVER AND BLACK MAZDA MPV VAN BEARING VIRGINIA LICENSE PLATE UMY8830 AND VIN NUMBER JM3LV522XT0811763 LOCATED THE DISTRICT OF MARYLAND | ~~UNDER SEAL~~ |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Aaron Klein, Special Agent with Homeland Security Investigations (HSI), being duly sworn and deposed, state as follows:

### INTRODUCTION

1.      Your affiant is an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18. Your affiant has been a Special Agent with HSI since September 2008.

2.      Your affiant has become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. Throughout the course of conducting narcotics investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting controlled purchases of narcotics; physical surveillance;



1

*M* 6/22/18

conducting short and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance, including wire interceptions; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

3.      Your affiant has been involved in numerous Title III wiretap investigations in the District of Maryland, both in a surveillance and monitoring capacity. Your affiant has also participated in a number of Organized Crime Drug Enforcement Task Force ("OCDETF") investigations concerning drug trafficking organizations and violent street gangs involved in the distribution of various controlled substances, including heroin, fentanyl, cocaine hydrochloride, cocaine base or "crack" cocaine, phencyclidine ("PCP"), and marijuana. Your affiant has participated in hundreds of hours of surveillance of drug dealers and drug traffickers and has observed countless "hand to hand" drug transactions. Through these investigations, your affiant has direct knowledge of the concealment methods utilized by drug and weapons traffickers, including the use of "stash" houses and locations utilized by drug traffickers to conceal weapons, narcotics, bulk currency, and drug distribution paraphernalia.

4.      As a result of this experience, your affiant is familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. Your affiant is aware that drug traffickers often utilize several locations to store narcotics and narcotics proceeds, including, but not limited to, their residences, vehicles, and stash houses (locations where drug traffickers store narcotics that are independent from their residences). Your

2

affiant is also aware that drug traffickers utilize "counter-surveillance" or erratic driving techniques to evade law enforcement detection. Based on your affiant's experience, drug traffickers also use cellular telephones, residential telephones, addresses, and vehicles that are not subscribed in their own names to avoid detection by law enforcement. In your affiant's experience, the use of pen registers and tracking devices has enabled law enforcement to identify previously unknown targets and locate areas used to store narcotics and narcotics proceeds that otherwise might not have been discovered.

5.      Based on your affiant's training and experience as a special agent with HSI, your affiant is familiar with the means and methods that narcotics traffickers use to import and distribute illicit drugs. Your affiant is familiar with the support and assistance that narcotics organizations require to conduct their illegal activities. Your affiant is also knowledgeable about the criminal statutes of the United States particularly in the area of criminal law relating to violations of the federal narcotics and conspiracy statutes.

6.      Your affiant has actively participated in investigations of criminal activity, including but not limited to, the investigation of drug smugglers and money launderers. During these investigations, your affiant has participated in the execution of search warrants and the seizure of evidence indicative of drug smuggling and money laundering violations. As a special agent, your affiant has testified under oath, affirmed the accuracy of affidavits in support of search and arrest warrants, and gained experience through participation in Title III wire intercept investigations. In these investigations, your affiant has monitored phone lines and conducted reactionary surveillance based on intelligence gathered from intercepted calls. Further, as part of these investigations, your affiant has been involved in the review of communications occurring



over cellular telephones between narcotics traffickers, their suppliers, and their customers in furtherance of their narcotics trafficking activities.

7.     Your affiant has learned that narcotics traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be subject to physical surveillance by law enforcement authorities. Your affiant has also learned that narcotics traffickers rarely refer to heroin, cocaine, cocaine base (also known as "crack"), phencyclidine ("PCP"), or other illegal drugs expressly by name. Instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, narcotics traffickers routinely refer to drugs, drug quantities, and drug prices by using seemingly innocuous words or phrases. Your affiant has become familiar the methods, language, and terms that narcotics traffickers use to disguise conversations about their narcotics activities.

8.     Your affiant also knows that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones, all in an effort to avoid detection and to impede law enforcement efforts. Your affiant also knows that drug traffickers communicate by use of text messaging to discuss types, quantities, and prices of narcotics, as well as to discuss meeting locations, all in an effort to elude detection and to impede the efforts of law enforcement. Your affiant knows that drug dealing is an ongoing process that requires the development, use, and protection of a communications network to facilitate daily narcotics distribution.

9.     Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances. These

4



books, records, receipts, notes, ledgers, bank records, money orders, etc., are maintained in locations to which the dealers in illegal controlled substances have ready access, such as in secure locations within their residences and their curtilage, the residences of family members, friends, and associates, the places of operation of their drug distribution activities (such as stash houses or safe houses), in business locations with which the trafficker is associated, or in storage areas.

10.     Individuals who deal in illegal controlled substances routinely conceal in their residences and/or curtilage, the residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities (such as stash houses or safe houses), large quantities of currency, financial instruments, precious metals, jewelry, and other items of value, typically proceeds of illegal controlled substance transactions.

11.     It is common for individuals who deal in the sale of illegal controlled substances, particularly Cocaine and/or Cocaine base, to secrete contraband related to the activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, hair dryers, blenders, pots, dishes and other containers for preparing Cocaine base, Cocaine, and other controlled substances for distribution, at their residences, or the residences of family members, friends or associates, in their business locations, or in the places of operation of their drug distribution activities such as stash houses, or safe houses, or storage areas.

12.     Individuals who deal in the sale and distribution of controlled substances commonly maintain telephone numbers and address books or papers which reflect names, addresses, and/or telephone numbers for associates in their illegal organization. These individuals often utilize cellular telephones, computers, and telephone systems to maintain contact with their associates in their illegal businesses. These telephone records, computers, bills, and telephone



5

numbers are often found in their place of residence, or the residences of family members, friends, or associates, in their business locations, or in the places of operation of their drug distribution activities (such as stash houses or safe houses), or storage areas.

13.     Individuals who deal in illegal controlled substances often take photographs of themselves, their associates, their property, and illegal contraband. These photos are usually maintained in their place of residence, or the residences of family members, friends or associates, in their business locations, or in the places of operation of their drug distribution activities, such as stash houses, safe houses or storage areas.

14.     Individuals who traffic in controlled substances maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in the places of operation of their drug distribution activities (such as stash houses or safe houses), or in storage areas. This documentary evidence includes, but is not limited to, telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, amounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions, and records indicating the existence of storage facilities used in narcotics trafficking.

15.     Individuals involved in narcotics trafficking often own, possess, and/or use weapons as a means of facilitating their illegal drug activities. Such weapons are most often secreted in their residences (including the surrounding curtilage), or the residences and curtilage of family members, friends, or associates, in their business locations, or in the places of operation of their drug distribution activities (such as stash houses or safe houses), or storage areas.



6

16.     Individuals who are members of ongoing drug organizations stay in regular contact with one another. This contact does not terminate once an individual is incarcerated. Incarcerated members of drug organizations routinely send letters to and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, from financial help to help engaging in witness intimidation or elimination. In addition, incarcerated members often keep photographs of themselves and other members of their organization in order to obtain respect from other inmates.

17.     Narcotics traffickers use their vehicles to store and transport narcotics and other contraband, often by concealing the controlled substances in hidden compartments of their vehicles. Narcotics traffickers also store firearms in their vehicles to protect their narcotics and drug proceeds. Narcotics traffickers also use their vehicles to purchase supplies of narcotics, distribute narcotics to customers, and collect money from their customers. For example, narcotics traffickers use their vehicles to drive to neutral meeting locations to meet with suppliers or customers, where drugs are exchanged for money (often inside of the drug dealer or customer's vehicle). Thus, evidence of narcotics distribution can often be found in a drug trafficker's vehicle.

18.     This affidavit is made in support of search warrants for the following locations:

**I.      177 WEST HAMBURG STREET, BALTIMORE, MARYLAND 21230**

**II.     1996 SILVER AND BLACK MAZDA MPV VAN BEARING VIRGINIA
LICENSE PLATE UMY8830 VIN NUMBER JM3LV522XT0811763
LOCATED IN THE DISTRICT OF MARYLAND[1]**



---

[1] As described in this affidavit, 177 West Hamburg Street, Baltimore, Maryland, was Anthony SEABROOK's residence. The second target facility—the **MAZDA MPV** bearing Virginia license plate UMY8830—was a van used by Arsenio CLECKLEY for drug trafficking.



## PROBABLE CAUSE

19.     During the course of this narcotics investigation, your affiant has learned about the methods of narcotics distribution employed by members of the Arsenio CLECKLEY Drug Trafficking Organization through discussions with confidential sources, cooperators, and other law enforcement officers, as well as through surveillance, the execution of search and seizure warrants, and the controlled purchases of heroin, fentanyl, and cocaine.

20.     In July 2017, the Prince George's County Police Department received a complaint from the management of the Cadillac Motel located at 16101 Crain Highway, Brandywine, Maryland 20613. Management informed law enforcement that the premises was being utilized as an open air drug market. The Prince George's County Police Department, Narcotic Enforcement Division, subsequently initiated an investigation into drug trafficking at the motel.

21.     In September 2017, law enforcement officers from the Narcotic Enforcement Division contacted Homeland Security Investigations, requesting federal assistance to further the investigation of the Arsenio CLECKLEY Drug Trafficking Organization. Your affiant has also learned that the Arsenio CLECKLEY Drug Trafficking Organization is involved in the distribution of narcotics in Washington, DC and Maryland.

22.     Arsenio Albright CLECKLEY, a/k/a "BUNDY," is a black male, with a date of birth of 05/17/1989. As discussed in more detail below, CLECKLEY was recently involved in the transportation and distribution of heroin, fentanyl, cocaine hydrochloride, and cocaine base in Prince George's County and Charles County, Maryland, and in Washington, DC.

8



23.     During the course of this investigation, your affiant identified at least two sources of supply who provided the Arsenio CLECKLEY Drug Trafficking organization with controlled substances—Thomas PARKER III and Anthony SEABROOK.[2]

24.     Anthony SEABROOK—referred to as "Tone," "Tony," and "Uncle" in wire interceptions—was a suspected drug trafficker and supplier of narcotics to CLECKLEY. SEABROOK was a black male, born on 10/01/1966. A criminal history query for SEABROOK produced the following criminal convictions:

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 1989 | Possession with Intent to Distribute 50 Grams or More of Cocaine Base | Washington, DC | Guilty (120 months' imprisonment) |
| 2004 | Intent to Distribute Crack Cocaine While Armed | Washington, DC | Guilty (60 months' imprisonment) |

25.     On March 8, 2018, the Honorable Paula Xinis, United States District Judge for the District of Maryland, signed an Order Authorizing the Interception of Certain Wire and Electronic Communications for telephone number (240) 676-9307 (Target Telephone 1), a number utilized by Arsenio CLECKLEY for a period of 30 days. Interception of oral and electronic communication from Target Telephone 1 continued from March 8, 2018 to April 7, 2018.

26.     On April 23, 2018, the Honorable Paula Xinis, United States District Judge for the District of Maryland, signed an Order Authorizing the Continued Interception of Certain Wire and Electronic Communications for telephone number (240) 676-9307 (Target Telephone 1), and Authorizing the Original Interception of Certain Wire and Electronic Communications for

[2] As discussed in more detail below, on June 5, 2018, law enforcement officers received information from the Maryland Department of Health, Office of the Chief Medical Examiner that Anthony SEABROOK was deceased, and that he was found deceased inside of 177 West Hamburg Street, Baltimore, Maryland. SEABROOK was discovered deceased after completing a drug deal with Arsenio CLECKLEY.

telephone numbers (202) 878-9969 (Target Telephone 2) and (240) 758-7903 (Target Telephone 3), numbers utilized by Thomas PARKER III. Interception of oral and electronic communication from Target Telephone 1 continued from April 23, 2018 to May 23, 2018.

27.    On May 25, 2018, the Honorable Paula Xinis, United States District Judge for the District of Maryland, signed an Order Authorizing the Continued Interception of Certain Wire and Electronic Communications for telephone number (240) 676-9307 (Target Telephone 1), and Authorizing the Original Interception of Certain Wire and Electronic Communications for telephone number (917) 975-1037 (Target Telephone 4), a telephone number used by Anthony SEABROOK. Interception·of oral and electronic communication from Target Telephone 1 began on May 25, 2018 and ended on June 24, 2018.

## SEABROOK MONEY LAUNDERING

28.    The term "interstate funnel account," hereafter funnel account, has been adopted by both the law enforcement community and the financial industry to describe a money laundering method that exploits the branch networks of financial institutions. The scheme involves the deposit and withdrawal of funds through an account, which enables criminal elements to obtain immediate access to money across state lines. The transactions are also conducted in a manner that frequently circumvents federal reporting requirements (identification is required for cash deposits over $10,000 United States dollars (USD)), and reduces the risk of law enforcement interdiction.

29.    Drug Trafficking Organizations (DTO) have used funnel accounts to launder illicit proceeds originating from the distribution of drugs. Funnel accounts are typically opened, or domiciled, by criminal organizations in geographical areas where the funds are withdrawn from the accounts, most often in locations along the Southwest Border.

10



30. Criminal organizations are known to use "straw" account holders to open accounts and conduct transactions. The account holder or banking customer who opens the funnel account is usually an associate of the DTO and not the smugglers themselves. In most cases, the account holders are paid by the actual drug smugglers to open bank accounts and are also paid for any use of the accounts. Usually, this fee is between $150 to $500 USD per transaction.

31. Once the account is open, the DTO will then communicate the account number to their customers around the United States, so the illicit customer can deposit cash into the organization's account. This method of paying for drugs or alien smuggling fees is as convenient as making a trip to the illicit customer's local bank branch. Criminal organizations also may maintain multiple funnel accounts to increase the movement of funds across the U.S. and to minimize the risk to their operation in case one of the accounts is comprised or closed by a bank. Funnel accounts are attractive to criminal enterprises because they allow easy and quick access to funds with low risk of detection. Because most banks immediately credit the balance of a bank account after cash has been deposited into the account, any signatory party on the account can withdraw the funds immediately.

32. Funnel accounts also appeal to criminal organizations because they allow for the conversion of small cash denominations typically associated with narcotic sales (i.e. $5, $10 and $20) that are deposited into funnel accounts and then can be withdrawn in larger denominations (e.g., $100 bills). Another reason funnel accounts are appealing to criminal organizations is because in cases where cash has been stored in close proximity to narcotics, funnel accounts enable the cash to be deposited into bank branches and subsequently withdrawn in another state where the cash has no odor or residue of narcotics. Finally, funnel accounts are appealing to drug

11



traffickers as they no longer have to risk seizure of the money through methods such as bulk cash smuggling.

33.     On April 1, 2018, there were 10 contacts between (202) 819-3565, a telephone number used by Anthony SEABROOK ("SEABROOK PHONE 1"), and (818) 640-4862.[3] A check of a commercial database linked this number to Gaddiel RAMIREZ, date of birth 7/16/1984. A check of the Financial Crimes Enforcement Network showed that the phone number (818) 640-4862 was linked to Gaddiel RAMIREZ on Currency Transaction Reports when RAMIREZ withdrew $11,000 in cash in April 2014, and again when he withdrew $10,600 in November 2016, from his Wells Fargo bank accounts.

34.     Documents received from Wells Fargo for the account of Gaddiel RAMIREZ listed (818) 640-4862 as his telephone number. A review of account records showed deposit activity in 2017 and 2018 in Maryland, Washington, D.C., South Carolina, Pennsylvania, Connecticut and California. Large cash deposits below the currency reporting threshold were made in the states listed above followed quickly by cash withdrawals in California.

35.     The following charts represent a sample of financial transactions which occurred within Wells Fargo Account Number ending in 0927 and Account Number ending in 8779. Account ending in 0927 is a checking account in the name of Yulma CHAVEZ, Taxpayer Identification number ending in 4409, 14202 Lanark Street, Panorama City, CA 91402. On January 24, 2018, Yulma CHAVEZ submitted a Legal Name Change Request to change her name from Yulma CHAVEZ to YULMA RAMIREZ. Account Number ending in 8779 is a checking account

---

[3] Phone records show that (818) 640-4862 is subscribed to Yulma RAMIREZ, 14202 Lanark Street, Panorama City, California. Yulma CHAVEZ (later changed to Yulma RAMIREZ) was a co-account holder on at least one Wells Fargo account with Gaddiel RAMIREZ.



in the name of Gaddiel H. RAMIREZ, 14202 Lanark Street, Panorama City, CA 91402. With the

exception of the 10/3/17 and 11/10/17 online transactions, the following deposits and withdrawals

are all cash transactions.

### Gaddiel RAMIREZ-Account Number 8779[4]

| Post Date | Deposit | Withdrawal | Transaction Location |
|---|---|---|---|
| 8/11/2017 | $5,000 | | Washington, DC |
| 8/14/2017 | | $5,000 | |
| 8/14/2017 | $5,000 | | Washington, DC |
| 10/2/2017 | $5,000 | | Washington, DC |
| 10/3/2017 | | $3,000 | Panorama City, CA |
| 10/3/2017 | | $2,000 | Online Transfer to Yulma CHAVEZ account (0927) |
| 10/18/2017 | $6,500 | | North Charleston, SC |
| 10/20/2017 | | $6,500 | |
| 11/8/2017 | $7,000 | | Summerville, SC |
| 11/9/2017 | | $5,000 | California |
| 11/10/2017 | | $2,000 | Online Transfer to Yulma CHAVEZ-Account (0927) |

### Yulma CHAVEZ-Account Number 0927[5]

| Post Date | Deposit | Withdrawal | Transaction Location |
|---|---|---|---|
| 8/14/2017 | $5,000 | | Washington, DC |
| 8/14/2017 | $5,000 | | Pikesville, MD |
| 8/14/2017 | $5,000 | | Baltimore, MD |
| 8/14/2017 | $5,000 | | Washington, DC |
| 8/14/2017 | | $2,000 | Panorama City, CA |
| 8/14/2017 | | $5,000 | Panorama City, CA |
| 8/14/2017 | | $2,000 | |
| 8/15/2017 | | $2,500 | Visalia, CA |
| 8/15/2017 | | $2,500 | |
| 8/16/2017 | | $3,000 | San Fernando, CA |

---

[4] Wells Fargo closed this account on March 7, 2018.

[5] Wells Fargo placed a hold on this account in March 2018 pending a business decision to end the relationship.



| 10/5/2017 | $3,000 | | Summerville, SC |
|---|---|---|---|
| 10/5/2017 | $3,000 | | Summerville, SC |
| 10/5/2017 | | $2,800 | |
| 10/18/2017 | $6,500 | | Goose Creek, SC |
| 10/20/2017 | | $6,500 | Panorama City, CA |
| 10/20/2017 | | $3,400 | Panorama City, CA |
| 10/23/2017 | | $2,700 | |
| 10/31/2017 | $2,000 | | Washington, DC |
| 10/31/2017 | $2,000 | | |
| 11/2/2017 | | $2,000 | Purchase-Van Nuys, CA |
| 11/9/2017 | | $4,000 | |

36.     Based on training and experience, your affiant believes both accounts have been used for the purpose of funneling proceeds from drug trafficking activities. In both accounts, cash deposits of several thousand dollars were made in the Maryland and Washington, DC areas. These deposits were immediately followed by a cash withdrawal of the funds in southern California within a few days. In addition, there are several cash deposits made in South Carolina. Your affiant is aware that SEABROOK PHONE 1 had frequent contact with two numbers with South Carolina area codes.

37.     Your affiant knows based on training and experience that cash deposits in a variety of cities throughout the country followed by rapid cash withdrawals in one locality is indicative of drug proceed funneling activity. This coupled with the telephone contacts between a telephone attributed to RAMIREZ and SEABROOK PHONE 1—who had just completed a drug trafficking trip to California (as described in the following section)—indicates that SEABROOK was recently involved in drug money laundering as part of his drug trafficking activities.

## SEABROOK DRUG TRAFFICKING

38.     In March 2018, CLECKLEY and SEABROOK arranged for two individuals named Christina MARSHALL and Ellis MACE to travel to Detroit, Michigan, and Los Angeles,

14



California. While in Los Angeles, MARSHALL and MACE sampled narcotics and provided a review of the narcotics to CLECKLEY.

39.     On March 13, 2018, at 1359 hours, Target Telephone 1 placed a voice call to (540) 735-6116, a telephone number utilized by John ALLEN (Call 2901). During this call, CLECKLEY states "Yeah, hey, how was that?" ALLEN responds, "The chunks all right, but the powder locked up." Your affiant believes that CLECKLEY and ALLEN are discussing narcotics. When CLECKLEY asks "how was that," your affiant believes CLECKLEY is inquiring as to the quality of the controlled substances that CLECKLEY distributed to ALLEN. Your affiant knows that "chunks" is a coded term for cocaine base. Your affiant also knows that "locked up" is a coded phrase used by drug traffickers to refer to an event where heroin coagulates and is unable to be injected.

40.     Later in the same conversation, CLECKLEY states to ALLEN "You like that better than aunt shit? Cause my peep, family gonna be back. In two, family gonna be back in a week."[6] ALLEN responds, "I like that better." CLECKLEY responds "what?" ALLEN responds "family." CLECKLEY responds "Alright, fam, you know, I'm just letting you know, family gonna be back in a week, matter of fact, you wanna go out of town?" ALLEN responds "I don't know. I don't care." CLECKLEY responds "Can you take off of work and go uh, and can, can you take off work and go to uh, he gonna send you out, Detroit." ALLEN responds "(inaudible) I'll probably just wait the week." CLECKLEY responds "Alright, well look, we, we already got Chrissy and them going anyway, so." ALLEN responds "Alright. Yeah." CLECKLEY responds "That's gonna be back in a week, I'm just letting you know, but uh, when that, when that come back it's gonna be

---

[6] As discussed later in this Affidavit, CLECKLEY and SEABROOK refer to coconspirator Terri BORDEAUX as "Cece," "aunt," and "auntie."



15

better, so for now on, when that come back your price, your price dropped down to a buck twenty."
ALLEN responds "(inaudible) I appreciate it man." CLECKLEY responds "Naw, I'm just letting
you know. Naw, cause it's gonna be better. Like, it's gonna, the price is gonna be cheaper for me
so it's gonna be cheaper for you."

41.     Your affiant believes that CLECKLEY is informing ALLEN that the controlled
substances that CLECKLEY provided to ALLEN were from a different source of supply than
CLECKLEY normally utilizes. When CLECKLEY states "family gonna be back in a week" and
asks ALLEN whether ALLEN is willing to take a trip to Detroit, your affiant believes that
CLECKLEY's primary source was SEABROOK (referred to here as "family"), that SEABROOK
had access to controlled substances in the Detroit, Michigan area, and that SEABROOK would
resume distribution of controlled substances to CLECKLEY in one week. When CLECKLEY
states "we already got Chrissy and them going anyway," your affiant believes that an individual
named "Chrissy" is planning to take a trip to Detroit to procure the controlled substances for
CLECKLEY and that when she returns with those controlled substances, the price will be cheaper
for both CLECKLEY and ALLEN. In addition, as your affiant is aware that CLECKLEY and
coconspirators refer to SEABROOK as "Uncle," your affiant believes that when CLECKLEY
refers to "family," he is referring to SEABROOK.

42.     On March 14, 2018, at 2128 hours, Target Telephone 1 placed a voice call to (301)
785-0723, a telephone number utilized by Christina MARSHALL (Call 3993). During this call,
CLECKLEY instructs MARSHALL to call (202) 819-3565, the number used by SEABROOK.
On multiple intercepted phone calls, MARSHALL self-identifies as "Chrissy." On March 14,
2018, at 2154 hours, Target Telephone 1 received a voice call from MARSHALL (Call 4004).
During this call, MARSHALL states "so he don't really listen to me or let me talk, but, he just

16



pulled up, he was supposed to get my information and then he left." MARSHALL then states she will call CLECKLEY back.

43. Your affiant believes that MARSHALL attempted to contact SEABROOK to provide her biographical information so that SEABROOK could make travel arrangements for MARSHALL. In support of this belief, records indicate that on March 14, 2018, there were 17 phone contacts between MARSHALL and SEABROOK.

44. On March 23, 2018, at 1326 hours, Target Telephone 1 received a voice call from SEABROOK (Call 9598). During this call, SEABROOK states "they coming up tomorrow, alright?" CLECKLEY responds "who?" SEABROOK responds "um, Chrissy and them, ya feel me?" CLECKLEY responds "yeah." SEABROOK responds "they, going, you know they going L... " CLECKLEY responds "I know." SEABROOK responds "so, I'm um going to meet them up there. So what happened was, the flight was something like in the thousands, so they got like one and some change." CLECKLEY responds "okay." SEABROOK responds "so now, give them at least about, 3, so that's enough for them." CLECKLEY responds "I can give them 2, I can give them 2 right now, I can drop off 2 right now to them." SEABROOK responds "alright, give em 2, You know what I'm sayin'. They got enough to get off the fuckin plane, and get to they destination. Then they got enough." CLECKLEY responds "Aight. Say no more. I'm about to give them some love right now." CLECKLEY and SEABROOK then discuss the flight time and SEABROOK confirms the flight leaves from Baltimore-Washington International Airport.

45. Your affiant believes that CLECKLEY and SEABROOK are discussing the financial arrangements for MARSHALL to fly to a location to pick up controlled substances for CLECKLEY. When SEABROOK states "give them at least about, 3" and "give em 2," your affiant believes that SEABROOK is referring to providing MARSHALL and MACE with $300 and $200,

17



respectively. When CLECKLEY states "I'm about to give them some love right now," your affiant believes that CLECKLEY is notifying SEABROOK that he plans on providing money to MARSHALL and MACE. In addition, when SEABROOK states "they, going, you know they going L," your affiant believes that SEABROOK was using "L" as a coded letter to represent Los Angeles, California.

46.     On March 23, 2018, at 1330 hours, Target Telephone 1 placed a voice call to MARSHALL (Call 9601). During this call, MARSHALL tells CLECKLEY that her flight is at 1900 hours the following day. CLECKLEY then states "I got to give you 200 more dollars to put on there," and later asks "you still got all that money on the card, right?" MARSHALL confirms and states "I got the leftover money from after what I paid for the flight, I already talked to your uncle about that."

47.     On March 25, 2018 at 1600 hours, law enforcement officers conducted surveillance at 15941 Livingston Road, Accokeek, Maryland and observed a tan Dodge Neon (Maryland tag 1CS1892) parked in the driveway. At 1606 hours, Christina MARSHALL was seen loading a red suitcase into the trunk of the Dodge Neon. Ellis MACE arrived in a red Honda Civic. At 1613 hours, Ellis MACE and Christina MARSHALL got into the back seat of the Honda Civic. The Civic turned right onto Farmington Road, where the surveillance was terminated.

48.     On March 25, 2018, law enforcement officers conducted surveillance on Christina MARSHALL and Ellis MACE as they departed on Spirit Airlines, flying from Baltimore Washington Airport to Detroit Metropolitan Airport. Law enforcement officers observed MARSHALL and MACE deplane in Detroit. At 2049 hours, Target Telephone 1 received a voice call from MARSHALL (Call 10596). During this call, CLECKLEY informed MARSHALL that



18

MARSHALL and MACE should have traveled to Los Angeles, not Detroit. MARSHALL and MACE subsequently booked a flight to Los Angeles International Airport.

49.    On March 26, 2018, law enforcement officers conducted surveillance on Christina MARSHALL and Ellis MACE as they deplaned at Los Angeles International Airport. At 2017 hours, Target Telephone 1 sent a text message to SEABROOK (Call 10935). This text message read "They made it." At approximately 1751 hours (local time in Los Angeles, California), law enforcement officers observed a Hispanic male and a black male, later identified as SEABROOK, arrive at Los Angeles International Airport and pick up MARSHALL and MACE in a white Chevy sedan bearing California license plate 7ZG214. Record checks revealed that this license plate is registered to Avis/Budget Car Rentals. According to the rental documents, the vehicle was rented by Anthony SEABROOK (DOB 10/01/1966), 1336 Parkwood Place, NW, Washington, DC 20010.

50.    On March 27, at 1335 hours, Target Telephone 1 received a voice call from MARSHALL (Call 11181). During this call, CLECKLEY asked MARSHALL "how was it?" MARSHALL responded, "It was, it was aight. It was like a, it was pretty good" and later stated "On a scale of 1-10, it's like a 8." Later in the conversation, MACE started talking with CLECKLEY. MACE stated, "I'm serious! It's, it's, it's nice. It's nice. But um, what you gotta, what you gotta understand though is, um, you know, the... the uncle, uncle made, uncle made it. You know what I'm sayin'." CLECKLEY responded, "Oh, he made it?" MACE responded, "Uh, you understand what I mean, made it like he already, you know." CLECKLEY responded, "Oh, did a... " MACE interrupted, "He chopped the lettuce up, you know, so we could have a salad." CLECKLEY responded, "Okay. Yeah, so you... " MACE responded, "And um, so, it wasn't, it

19



wasn't you know, real, like, to say, you know what I'm sayin'? He, he did his thing to it, for safety reasons, you understand me?"

51.     Your affiant believes that MARSHALL and MACE were providing CLECKLEY a review of controlled substances that they tested in Los Angeles. Your affiant further believes that when MACE refers to "Uncle," he is referring to SEABROOK, as multiple individuals have referred to SEABROOK over Target Telephone 1 as CLECKLEY's uncle. When MARSHALL stated, "was pretty good" and "it's like an 8," your affiant believes that MARSHALL was grading the controlled substance. Your affiant is aware that "chopping lettuce" is a coded phrase for cutting a controlled substance. When MACE states "He chopped the lettuce up, you know, so we could have a salad," your affiant believes that MACE is informing CLECKLEY that SEABROOK diluted the controlled substance prior to MACE and MARSHALL testing it. Furthermore, your affiant believes that MACE is referring to heroin or fentanyl. When MACE states "he did his thing to it, for safety reasons," your affiant believes that heroin or fentanyl was involved as heroin and fentanyl are opiates which can cause overdoses if ingested in an undiluted form.

52.     On April 5, 2018 at 1956 hours, members of the surveillance team initiated surveillance after intercepted calls indicated that CLECKLEY and SEABROOK intended to have a meeting. Investigators observed CLECKLEY running from a red Hyundai Elantra bearing Illinois tag AK86484 parked inside the parking garage of Maryland Live Casino, 7002 Arundel Mills Circle, Hanover, Maryland, and into the casino. At 2009 hours, surveillance was initiated in the area of the Olive Garden Restaurant, 7061 Arundel Mills Cir, Hanover, Maryland 21076 after telephone intercepts indicated that SEABROOK was at the restaurant. Surveillance was moved inside the restaurant after SEABROOK directed CLECKLEY to come to the Olive Garden. At 2015 hours, members of the surveillance team observed SEABROOK sitting with an unidentified



20

black female. At 2023 hours, the surveillance team observed CLECKLEY enter Olive Garden and

sit with SEABROOK and the unknown female. At 2030 hours, SEABROOK and CLECKLEY

exited the Olive Garden together and observed CLECKLEY and SEABROOK get into

CLECKLEY's rented red Elantra and move the car over four parking spaces. At 2042 hours,

CLECKLEY and SEABROOK walked back into the Olive Garden. At 2110 hours, CLECKLEY,

an unidentified black male and the unknown female (who were seen with CLECKLEY at the

nearby casino) exited the Olive Garden and leave in the red Hyundai Elantra. At 2116 hours,

SEABROOK accompanied by the unidentified female left the Olive Garden. SEABROOK and his

companion left in a silver Mercedes Benz, bearing MD tags 1DD8373. At 2139 hours, the vehicle

arrived at the parking lot of some townhouses located at or near 177 West Hamburg Street,

Baltimore. Surveillance units were unable to observe SEABROOK or his companion enter any of

the units, due to the lack of illumination in the rear parking lot. At 2210 hours, the surveillance

was ended.

53.    On April 19, 2018, law enforcement officers observed SEABROOK carry trash to

a community dumpster outside of **177 WEST HAMBURG STREET, BALTIMORE,**

**MARYLAND.**

54.    On April 26, 2018, at 1442 hours, Target Telephone 1 received a voice call from

SEABROOK PHONE 1 (Call 17995). During this call, CLECKLEY and SEABROOK coordinate

a meeting location. CLECKLEY informs SEABROOK that "I don't have a car" in an effort to

explain why CLECKLEY cannot meet SEABROOK outside of Washington, DC. CLECKLEY

then states, "I'm just trying to give you this before I go out of town." CLECKLEY then texts the

following address to SEABROOK (Call 18002): "2641 Wade Street SE Washington, DC," and

SEABROOK calls back on SEABROOK PHONE 1 to confirm receipt of the text (Call 18010).



Target Telephone 1 and SEABROOK PHONE 1 exchanged 6 additional calls and text messages to coordinate a meeting in Washington, DC.

55.     Based on training and experience your affiant believes that CLECKLEY is meeting with SEABROOK to provide SEABROOK with money for controlled substances that SEABROOK provided to CLECKLEY. When CLECKLEY stated "give you this car," your affiant believes that CLECKLEY was utilizing coded language for money. This belief is supported by the fact that while trying to coordinate a meeting location, CLECKLEY specifically informs SEABROOK that he does not "have a car" as justification for not meeting with SEABROOK outside of the Washington, DC area.

56.     On May 9, 2018, investigators observed CLECKLEY's van—a **MAZDA MPV** bearing Virginia tag UYM8830—parked at 2641 Wade Road SE, Washington, DC.[7] On that date, investigators observed CLECKLEY engaged in suspected narcotics transactions in the area of 2641 Wade Road.

57.     On May 9, 2018, at 1349 hours, Target Telephone 1 received a voice call from Target Telephone 4 (Call 24177). During this call, SEABROOK and CLECKLEY discussed their plan for the day. CLECKLEY told SEABROOK, "Uhh, I'm in DC. You can come anytime." CLECKLEY continued, "Naw, I got my son. I'm in DC. I ran out there, and need to collect some dough, but I'm in DC." Later SEABROOK stated, "Alright, it'll be later on this evening, okay then, alright family." Based on training and experience, your affiant believes CLECKLEY and SEABROOK are discussing a meeting where CLECKLEY will be providing money for fronted controlled substances to SEABROOK. When CLECKLEY states, "I'm in DC. I ran out there, and

---

[7] This vehicle is registered to Kenneth Claude Hamilton Jr. at 5010 Ayers Place, SE, Washington, DC 20019

22



Case 8:18-mj-01792-TMD   Document 3   Filed 07/25/18   Page 23 of 61

need to collect some dough," your affiant believes that CLECKLEY needs to procure money from drug distribution sales in order to pay SEABROOK what CLECKLEY owes SEABROOK.

58.     At 1555 hours, Target Telephone 1 placed a voice call to (202) 867-9722, a telephone used by Terri BORDEAUX (Call 24247). During this call, CLECKLEY tells BORDEAUX, "I need the key, I'm a pull up." At 1601 hours, Target Telephone 1 placed a second voice call to BORDEAUX (Call 24252). During this call, CLECKLEY states, "come open the door." At 1817 hours, Target Telephone 1 received a text message from Target Telephone 4 (Call 24359). This text message read, "Near U by 730 or 800." At 1824 hours, Target Telephone 1 received a text message from Target Telephone 4 (Call 24362). This text message read, "Where r u." At 1834 hours, Target Telephone 1 received a text message from (202) 867-9722, a telephone used by Terri BORDEAUX (Call 24366). This text message read, "Hey unlc.said where are you going." At 1905 hours, Target Telephone 1 sent three text messages to Target Telephone 4 (Calls 24370, 24371, 24372). These text messages read: "We Se 2146 wade rd." At 1944 hours, Target Telephone 1 received a voice call from Target Telephone 4 (Call 24385).

59.     During this call, CLECKLEY asked SEABROOK, "Yeah where are you at Pop?" CLECKLEY continued, "I had my phone... when I called Cece, I had my phone in the charger. It was dead, and I had a crazy girl calling my phone. I texted you the address." SEABROOK replied, "Nah why don't you do this... why don't you go ahead and give it to uh... she can count it right there. Give it to auntie, because you got your son." CLECKLEY said, "Yeah I do, I do, I do got him. Uh... alright uh... alright I'm going to give it to auntie. I'm down where you came at... by Barry Farms. At the house." CLECKLEY and SEABROOK discussed meeting and CLECKLEY said he would text SEABROOK the address. SEABROOK then asked, "Oh at the other house?" CLECKLEY replied, "Wade, Wade, Wade, Wade."



23

60.     Based on training and experience, your affiant believes that CLECKLEY and SEABROOK are discussing payment that CLECKLEY owes SEABROOK for controlled substances. When CLECKLEY states, "Nah why don't you do this... why don't you go ahead and give it to uh... she can count it right there. Give it to auntie, because you got your son," your affiant believes that SEABROOK is instructing CLECKLEY to provide the money to BORDEAUX. Your affiant is aware that CLECKLEY and SEABROOK refer to BORDEAUX as "auntie" and that CLECKLEY and SEABROOK conduct meetings at her residence in Washington, DC. At 1946 hours, Target Telephone 1 placed a voice call to (202) 867-9722, a telephone used by Terri BORDEAUX (Call 24387). During this call, BORDEAUX tells CLECKLEY that she is on her way. At 2013 hours, Target Telephone 1 placed a second voice call to BORDEAUX (Call 24398). During this call, BORDEAUX tells CLECKLEY that she is at the light and about to turn on Stevens Road. Based on training and experience, your affiant believes that CLECKLEY and BORDEAUX are meeting so that CLECKLEY can provide BORDEAUX with money that BORDEAUX will, in turn, provide to SEABROOK for controlled substances.

61.     At 2159 hours, Target Telephone 1 received a voice call from Target Telephone 4 (Call 24437). During this call, CLECKLEY told Seabrook, "Yeah Cece came by." SEABROOK replied, "Yeah you uh... is she right? What she told me, you told me something different from the other day right?" CLECKLEY continued, "Nah I thought... my man... dude didn't come through." SEABROOK acknowledged what CLECKLEY said, and CLECKLEY added, "Because you know... [Stammers] I still got a buck seventy left." SEABROOK said, "I know, nah I know you still good." CLECKLEY continued, "I'm trying to get it fast... I gotta get it back going. I got it going, but it's coming." SEABROOK replied, "I got you, I got you, No problem, as long as you're alright. I know you just told me... " CLECKLEY interrupted, "I'm good, I'm good." SEABROOK



24

continued, "Yeah, that's why I did that for you." CLECKLEY replied, "I got... listen, [Stammers] I got my man... my man is about to come up." SEABROOK stated, " [Stammers] I did... that's why I did twice is nice for you... you know what I mean?" SEABROOK later said, "Yeah okay cool but I wanted to speak to you about something because I didn't want to do something... " CLECKLEY replied, "You can pull up on me. Come to the house." Later SEABROOK said, "I'm going to see you in the next day or so... Alright?"

62.     Based on training and experience, your affiant believes that CLECKLEY and SEABROOK are discussing the distribution of controlled substances and payment for those controlled substances. When SEABROOK states, "is she right? What she told me, you told me something different from the other day right," your affiant believes that SEABROOK is referring to BORDEAUX counting money that CLECKLEY left for SEABROOK and SEABROOK is questioning if it was accurate. When CLECKLEY replies, "Nah I thought... my man... dude didn't come through," you affiant believes that CLECKLEY is informing SEABROOK that the amount is less than anticipated because CLECKLEY did not receive enough money from his purchaser. Your affiant also believes that SEABROOK is about to obtain a source of narcotics from SEABROOK's source of supply. In response to CLECKLEY stating, "You can pull up on me. Come to the house," SEABROOK responds, "Yeah but... my other team is coming to say hello to me right now." Your affiant believes that "my other team" is a coded term for SEABROOK's source of supply and that "say hello" is a coded term for bringing SEABROOK controlled substances.

63.     On May 15, 2018, at 1933 hours, Target Telephone 1 placed a voice call to Target Telephone 4 (Call 26639). During this call, SEABROOK referred to CLECKLEY as "Nephew." CLECKLEY replied, "Yeah, yeah. I got Cece [Unintelligible] at the house." SEABROOK said,



"Yeah, well, tell her I'm gon' see 'er tomorrow because it started rainin'. So I'll, I'm turnin' around, you know?" CLECKLEY continued, "Aight, well, it's gon' be, uh... it's, like, right now it's... twenty-five but somebody gon' drop off fifteen so it's gon' make it five [Unintelligible]." SEABROOK replied, "Aight... No problem. Aight. No problem. [Unintelligible]." CLECKLEY continued, "And then [Unintelligible]... 'ey, I'm 'bout to go, I'm 'bout to go outta town, but I'm a have everything. I'm a get it dropped off to Cece. But I'm a need to see you again, though." SEABROOK responded, "Aight.,., we'll catch up tomorrow at Cece's. [Unintelligible]. Aight."

64.    Based on training and experience, your affiant believes that CLECKLEY and SEABROOK are discussing the exchange of money for controlled substances and will be exchanging the money and narcotics via BORDEAUX. When SEABROOK states, "tell 'er I'm gon' see 'er tomorrow," your affiant believes that "her" is referring to BORDEAUX and that SEABROOK will meet with BORDEAUX on the following day. When CLECKLEY responds, "right now it's... twenty-five but somebody gon' drop off fifteen so it's gon' make it five," your affiant believes that CLECKLEY is informing SEABROOK of the money that CLECKLEY owes SEABROOK. Your affiant believes that CLECKLEY owes SEABROOK $2,500 and has $500 to provide to SEABROOK. When CLECKLEY states, "somebody gon' drop off fifteen," your affiant believes that CLECKLEY will be paid an additional $1,500 from someone who owes CLECKLEY $1,500. Accordingly, the $1,500 plus the $500 that CLECKLEY has equates to $2,000 of the $2,500 that your affiant believes CLECKLEY owes SEABROOK for controlled substances that SEABROOK has fronted. When CLECKLEY states, "so it's gon' make it five," your affiant believes that CLECKLEY is informing SEABROOK that CLECKLEY will still owe $500. Finally, your affiant believes that CLECKLEY is requesting more controlled substances to be



26

fronted to him by SEABROOK. When CLECKLEY states, "I'm a need to see you again, though," your affiant believes that CLECKLEY is requesting additional narcotics.

65.     On May 28, 2018, at 1329 hours, Target Telephone 4 exchanged a series of text messages with Target Telephone 1 (Calls 1526, 1527, 1528, 1530). The following is a draft transcript of the text messages between Anthony SEABROOK (AS) and Arsenio CLECKLEY (AC):

> AC:   Bring me 200 dollars.
>
> AC:   Please if u could.
>
> AC:   Call me and my brother trying see grandma too if she around.
>
> AS:   Ok.

66.     Your affiant believes that CLECKLEY is requesting that SEABROOK provide him with 200 grams of heroin or fentanyl. Your affiant believes that "200 dollars" is a coded term for 200 grams of a controlled substance and when CLECKLEY writes "bring me 200 dollars," CLECKLEY is requesting that SEABROOK supply him. In addition, your affiant believes that CLECKLEY is informing SEABROOK that another individual is interested in purchasing heroin or fentanyl. When CLECKLEY states "Call me and my brother trying see grandma too if she around," your affiant believes that "grandma" is a coded term for heroin or fentanyl and that "my brother trying to see grandma" is a reference to another individual seeking to purchase heroin or fentanyl from SEABROOK if "she is around," which your affiant believes is a coded phrase for whether SEABROOK has additional narcotics to supply.

67.     At 1710 hours, Target Telephone 4 received a voice call from (240) 802-0302, a telephone used by Arsenio CLECKLEY (Call 1544). The following is a draft transcript of the call between Anthony SEABROOK (AS) and Arsenio CLECKLEY (AC):

27

AS:   [Inaudible]… Yeah.

AC:   What time you gonna pull up pops?

AS:   I don't know. Probably be about six. [Inaudible] probably about seven thirty, eight thirty tops.

AC:   Aight, cause I'm a have the Garage Boys come up.

AS:   Whatever time it be, you know what I mean? So.

AC:   Aight, just, just, just because of Grant. They wanted to stop by the old folk home to see grandma.

AS:   I'm talking about you though.

AC:   Oh yeah, I need what uh… what I text you. Yeah I need, whatever, I need it too. I'ma get my hands on it too, fuck it. I'm a, I'm a do everything. Whatever you give me, I got it but.

AS:   What was they… talking about?

AC:   They talking about that they want two of them.

AS:   I, I ain't say all that right there. Um… but what I'm starting to [Inaudible] right here… Cece was talking about stuff. I guess.

AC:   Huh?

AS:   I don't know. Cece was talking about something… but I know you was just… talking about what she was talking about right?

AC:   Yeah, I was talking about what I needed right? But I'm telling you.

AS:   I understand that, but what I'm saying to you is she said… "oh this is right here," and I said "no, he told me something different Cece. I don't know what the fuck you talking about," you know what I mean?

AC:   Oh I don't know what Cece talking about, but I text you though.

AS:   Yeah, I know you told me; you said "look, I'm here, and you know I'm not dealing with that." That's what you talking about right?

AC:   Yeah, I'ma owe you like… I got cash, I just owe you like two twenty-five left.

AS:    Aight, it ain't no problem. We'll see what it is. I don't know what the person at the notary; what they gonna charge or not, but we'll see. Well talk when we there.

AC:    Aight, don't, just don't forget about what I just text you.

AS:    Aight no problem.

AC:    Yeah, aight. And uh, whatever you could do with grandma. The Garage Boys; I told, got, they coming up; they got, you know what I'm saying? What you need.

AS:    I hear you. No problem. Aight.

AC:    Aight.

68.    Your affiant believes that CLECKLEY and SEABROOK are coordinating a deal to procure heroin or fentanyl. Your affiant knows that the "Garage Boys" is a coded term for William STEWART and Devin SIMMONS, who distributed narcotics in Charles County from a location at 4030 Dunnington Thomas Place in Marbury, Maryland. This location is commonly referred to as "The Garage." Your affiant believes that "They wanted to stop by the old folk home to see grandma" is a coded phrase for wanting to purchase heroin from SEABROOK. When CLECKLEY states "Oh yeah, I need what uh... what I text you. Yeah I need, whatever, I need it too. I'ma get my hands on it too, fuck it. I'm a, I'm a do everything," in response to SEABROOK stating "I'm talking about you though," your affiant believes that CLECKLEY is confirming his order of 200 grams of heroin. When CLECKLEY states "They talking about that they want two of them," in reference to the "Garage Boys," your affiant believes that CLECKLEY is referring to two ounces of heroin. When CLECKLEY states "I got cash, I just owe you like 2, 25 left," your affiant believes that CLECKLEY is referring to money that is owed to SEABROOK for narcotics



29

that SEABROOK previously fronted to CLECKLEY. Your affiant believes that CLECKLEY

owes SEABROOK $2,500.

69.     At 2003 hours, Target Telephone 1 received a voice call from (240) 412-1993, a

telephone used by William STEWART (Call 29376). The following is a draft transcript of the call

between Arsenio CLECKLEY (AS) and William STEWART (WS):

> AC:   [Inaudible].
>
> WS:   [Inaudible]… hello?
>
> AC:   Yeah, I'm wait, I'm waiting on him for the call right now, Will. He's on his way up, gonna give me a call… [Inaudible].
>
> WS:   Alright, that's a bet.
>
> AC:   [Inaudible].
>
> WS:   [Inaudible].
>
> AC:   You said, huh?
>
> WS:   [Inaudible]… on standby?
>
> AC:   Huh?
>
> WS:   Is that, it's going to be within the hour though?
>
> AC:   Yeah, yeah, it's going to [Inaudible]… it's going to be tonight. I'm waiting too, I need something, so it's got to be tonight [Inaudible].
>
> WS:   [Inaudible].
>
> AC:   [Inaudible]… he told me like 9, 8:30, 9 o'clock, he's going to be heading up.
>
> WS:   Alright, I'm about to go grab it. [Inaudible].
>
> AC:   I mean, you know, you're good, just hold it… [Inaudible]… you say you only wanted two [Inaudible]… it's light, you get two… [Inaudible]… of two…



30

WS:   No, I got, no, I'm saying, I got... [Inaudible].

AC:   [Inaudible].

WS:   [Inaudible].

AC:   [Inaudible].

WS:   Yeah.

AC:   Alright.

70.    Your affiant believes that CLECKLEY and STEWART are discussing a meeting so they can procure heroin or fentanyl from SEABROOK. When CLECKLEY states "I'm waiting on him for the call right now," your affiant believes that CLECKLEY is referring to SEABROOK. When CLECKLEY states "it's going to be tonight. I'm waiting too, I need something, so it's got to be tonight," your affiant believes that CLECKLEY is low on his current supply of narcotics and is dependent on SEABROOK to provide him with a new supply. When CLECKLEY states "you say you only wanted two [Inaudible]... it's light, you get two," your affiant believes that CLECKLEY is confirming with STEWART that STEWART wants to procure two ounces of heroin or fentanyl.

71.    At 2016 hours, Target Telephone 4 placed a voice call to (240) 802-0302, a telephone used by Arsenio CLECKLEY (Call 1557). The following is a draft transcript of the call between Anthony SEABROOK (AS) and Arsenio CLECKLEY (AC):

AC:   Hey... hello?

AS:   I'm coming down. I'm coming down. Just in a little in a jam on 295. Um, you at the house?

AC:   Aight. How long? Yeah, I'm about to go to [Inaudible] right now. I'm about to turn around. I'm about to just go there and wait. How long you gonna be?



AS:   I'm just saying, I don't, I mean, I'm right over here passing the casino now. It's just a little jam, I don't know how long it should, how long it should be though. You know what I mean?

AC:   Probably like, probably like, uh. Probably like, uh, you be there like 9:30?

AS:   Probably say like that. Um, did you say something about them kids too?

AC:   Yeah, the Garage Boys is wanting.

AS:   They gonna be there with you?

AC:   Yeah, they gonna, they want 56, that's all. Just, just… two of them, that's it.

AS:   Aight. Aight, I understand. Aight.

AC:   Aight, and I need me.

72.     Your affiant is aware that an ounce is a common measurement used for controlled substances and there are 28 grams in an ounce. When CLECKLEY states "they want 56," in response to SEABROOK asking, "did you say something about them kids too," your affiant believes that he is requesting that SEABROOK provide an additional 56 grams of heroin to provide to the "Garage Boys." This is consistent with the earlier communication where CLECKLEY stated that the "Garage Boys" wanted "two of them." In addition, your affiant is aware that 295 is a freeway in the District of Maryland and believes that SEABROOK was traveling on 295 on his way to meet with CLECKLEY to distribute heroin or fentanyl.

73.     At 2018 hours, Target Telephone ·1 placed a voice call to (240) 412-1993, a telephone used by William STEWART (Call 29382). The following is a draft transcript of the call between Arsenio CLECKLEY (AS) and William STEWART (WS):

WS:   Hello?

AC:   [Inaudible]… meet me, uh, be up at 9:30… [Inaudible].



74.    Your affiant believes that CLECKLEY and STEWART are confirming a meeting at 9:30 p.m. to procure heroin or fentanyl from SEABROOK.

75.    At 2019 hours, Target Telephone 1 received a voice call from (240) 419-8059, a telephone used by UM-8059 (Call 29384). The following is a draft transcript of the call between Arsenio CLECKLEY (AS) and UM-8059 (UM):

> UM:    Yo.
>
> AC:    Who this?
>
> UM:    [Inaudible].
>
> AC:    Oh, alright, go to, uh, meet me at Pennsylvania Avenue at 9:30.
>
> UM:    Alright, bet.

76.    Your affiant believes that CLECKLEY, STEWART, and SEABROOK will be meeting at 2323 Pennsylvania Avenue SE, Apartment 314, Washington, DC 20020. Your affiant is aware that Terri BORDEAUX resides in Apartment 314 of The Grays on Pennsylvania, an apartment complex that is located on the corner of Pennsylvania Avenue and Prout Street in Southeast Washington, DC. Your affiant further believes that CLECKLEY is informing UM-8059 that CLECKLEY will be obtaining a supply of narcotics at 9:30 p.m. and that UM-8059 should meet CLECKLEY at the Pennsylvania address to purchase heroin or fentanyl from CLECKLEY.

77.    At 2121 hours, Target Telephone 1 received a voice call from (301) 266-5059, a telephone used by UM-5059 (Call 29399). The following is a draft transcript of the call between Arsenio CLECKLEY (AS) and UM-5059 (UM):

> UM:    [Inaudible].
>
> AC:    What's up little Matt.
>
> UM:    [Inaudible]… figure out anything on the up.



33

· AC:    I'm about to, I'm about to get it right now... [Inaudible]... matter of fact, come to Pennsylvania Avenue, I'll let you holler at my Aunt, my Aunt got that shit.

UM:    Alright... [Inaudible]... same, same spot you was staying at before?

AC:    Pennsylvania Avenue, hurry up.

UM:    Yeah, no, I was just saying, by the, by the, the gas station and shit, Sunoco.

AC:    Yeah.

UM.    Aight. Aight.

78.    Your affiant believes that UM-5059 is attempting to purchase cocaine or cocaine base from CLECKLEY. Your affiant is aware that "up" is a coded term for cocaine or cocaine base. Furthermore, your affiant believes that this call confirms that CLECKLEY is going to receive heroin or fentanyl from SEABROOK. When CLECKLEY states "I'm about to, I'm about to get it right now... [Inaudible]... matter of fact, come to Pennsylvania Avenue, I'll let you holler at my Aunt, my Aunt got that shit," your affiant believes CLECKLEY is referring UM-5059 to Terri BORDEAUX to purchase cocaine or cocaine base at 2323 Pennsylvania Avenue SE, Apartment 314, Washington, DC 20020. When CLECKLEY states, "I'm about to get it right now," your affiant believes CLECKLEY was referring to BORDEAUX as the source of supply for cocaine. Your affiant believes that if SEABROOK was supplying cocaine to CLECKLEY during this meeting, CLECKLEY would not have given the sale to his BORDEAUX.

79.    At 2117 hours and 2120 hours, CLECKLEY, utilizing (240) 802-0302, placed two voice calls to Target Telephone 4 (Calls 1558, 1560). These calls were not answered. At 2129 hours, CLECKLEY, utilizing (240) 802-0302, sent a text message to Target Telephone 4 (Call 1562). This text message read "How long pops."



34

80. Your affiant believes that CLECKLEY is trying to determine when SEABROOK will arrive to provide CLECKLEY with heroin or fentanyl.

81. At 2135 hours, Target Telephone 4 received a voice call from (240) 802-0302, a telephone used by Arsenio CLECKLEY (Call 1571). The following is a draft transcript of the call between Anthony SEABROOK (AS) and Arsenio CLECKLEY (AC):

> AC:  [Aside: That's you right there?].
>
> AS:  Hello.
>
> AC:  That's you right there?
>
> AS:  Nah man, I'm in traffic. I'm coming down. I'm passing the Greenbelt exit right now.
>
> AC:  Alright.
>
> AS:  Okay. Aight, one.
>
> AC:  One.

82. Your affiant believes that CLECKLEY is trying to determine when SEABROOK will arrive at 2323 Pennsylvania Avenue SE, Apartment 314, Washington, DC 20020 to provide CLECKLEY with heroin or fentanyl. In addition, your affiant knows that the Greenbelt Road exit is in the District of Maryland.

83. At 2143 hours, Target Telephone 4 received a voice call from (202) 867-9722, a telephone used by Terri "Cece" BORDEAUX (Call 1574). The following is draft transcript of the call between Anthony SEABROOK (AS) and Terri BORDEAUX (TB):

> AS:  Hello? Hello?
>
> TB:  Hello brother.
>
> AS:  Yeah.

TB:     [Inaudible].

AS:     What are you saying?

TB:     I said what'ch you doing, you driving?

AS:     Come on Cece, I just told him where I'm at. I'm in traffic.

TB:     I don't, I'm not with him. I don't know what you told him. I'm asking you.

AS:     [Inaudible].

TB:     I'm not with him. I just told him, I don't know what you told him. I'm calling you myself.

AS:     [Inaudible]... Okay, aight.

84.     Your affiant believes that SEABROOK and BORDEAUX are discussing SEABROOK's arrival time in order for SEABROOK to distribute heroin or fentanyl at 2323 Pennsylvania Avenue SE, Apartment 314, Washington, DC 20020.

85.     At 2145 hours, Target Telephone 4 received a voice call from (202) 867-9722, a telephone used by Terri BORDEAUX (Call 1576). The following is draft transcript of the call between Anthony SEABROOK (AS) and Terri BORDEAUX (TB):

AS:     Yeah.

TB:     Look, I am not with Arsenio. I'm in the house. Arsenio is out in the street somewhere. I'm [Inaudible].

AS:     [Inaudible]... I don't have a time, I'm on the highway, bad accident... just at the Greenbelt exit. You know what I mean? I'm driving like some goddamn, I got some sense. I'm not going to be ballin' out like him, you feel me?

TB:     Right, I didn't even know that you was out there. I was about to say I was gonna go with you out there [Inaudible]... don't have enough time to go over there.



36

86. Your affiant believes that SEABROOK and BORDEAUX are discussing SEABROOK's arrival time at 2323 Pennsylvania Avenue SE, Apartment 314, Washington, DC 20020 in order for SEABROOK to meet and distribute heroin or fentanyl. Furthermore, your affiant believes that SEABROOK is conscious of the fact that he is driving while in possession of a significant amount of heroin or fentanyl. When SEABROOK states "I'm driving like some goddamn, I got some sense. I'm not going to be ballin' out like him," your affiant believes SEABROOK is informing BORDEAUX that he is driving carefully so as to not draw any attention from law enforcement.

87. At 2200 hours, Target Telephone 4 placed a voice call to (202) 867-9722, a telephone used by Terri BORDEAUX (Call 1581). The following is draft transcript of the call between Anthony SEABROOK (AS) and Terri BORDEAUX (TB):

TB: Hello.

AS: Yeah, we right here um... you could tell nephew I'm about five minutes from you.

TB: Five minutes, okay. He already downstairs, outside.

AS: Huh?

TB: He's already outside... in the, in the truck, in the car. I'll call him back... [Inaudible].

AS: Alright, no problem. Alright, cool.

88. Your affiant believes that SEABROOK and BORDEAUX are discussing SEABROOK's arrival time in order for SEABROOK to meet and distribute heroin or fentanyl at 2323 Pennsylvania Avenue SE, Apartment 314, Washington, DC 20020.

89. At 2200 hours, Target Telephone 4 placed a voice call to (202) 867-9722, a telephone used by Terri BORDEAUX (Call 1583). This call was not answered, but SEABROOK



37

can be heard saying "Smart man" in the background. Your affiant believes that SEABROOK may have been speaking to an unknown individual in the vehicle.

90.     At 2208 hours, Target Telephone 4 placed a voice call to (240) 802-0302, a telephone used by Arsenio CLECKLEY (Call 1584). The following is draft transcript of the call between Anthony SEABROOK (AS) and Arsenio CLECKLEY (AC):

> AS:     [Inaudible].
>
> AC:     [Aside: I got you, I'm about to get you around the way]... hello?
>
> AS:     Yeah, yeah, you in the building?
>
> AC:     Open the door.
>
> AS:     Aight, I'm in the rental, there was some [Inaudible] outside so I went around.
>
> AC:     Alright, I'm uh, I'm, I'm in the building.
>
> AS:     Alright, I'm coming, I'm coming back around. Tell Cece to come on downstairs.
>
> AC:     I'm coming downstairs.
>
> AS:     Alright.

91.     At this time, law enforcement officers were conducting surveillance at 2323 Pennsylvania Avenue in Washington, DC. Law enforcement officers observed a black Mitsubishi Outlander bearing Maryland plate 5DE1921 arrive at approximately 2210 hours and park on Prout Street. A male—believed to be SEABROOK—exited the vehicle and walked toward the apartment complex. Subsequent record checks revealed the vehicle is an Avis/Budget rental car and the vehicle was rented to SEABROOK through June 1, 2018.

38



92.    On May 28, 2018 at 2209 hours, Target Telephone 1 placed a voice call to (240) 412-1993, a telephone used by William STEWART (Call 29418). The following is a draft transcript of the call between Arsenio CLECKLEY (AS) and William STEWART (WS):

> WS:    Hello?
>
> AC:    Yeah, where you at?
>
> WS:    Hello?
>
> AC:    Where you at?
>
> WS:    I think like 10 minutes away.
>
> AC:    Well you got to hurry up, baby boy.
>
> WS:    Alright, I'm coming.
>
> AC:    [Inaudible]... told you the time.
>
> WS:    I'm... [Inaudible].
>
> AC:    Can't keep him here, bro.
>
> WS:    Alright.
>
> AC:    And he not going to give it to me because I ain't got the money to hold it, I already owe him like 5.
>
> WS:    Alright, I'm coming, tell him to hold on. Be right there.
>
> AC:    Man, I told you, alright, I'm a try. Hey, uh.
>
> WS:    Alright.

93.    Your affiant believes that CLECKLEY and STEWART are discussing STEWART's arrival time at 2323 Pennsylvania Avenue SE, Apartment 314, Washington, DC 20020 in order for them to meet and received heroin or fentanyl from SEABROOK. When CLECKLEY states "And he not going to give it to me because I ain't got the money to hold it, I

39



already owe him like 5," after telling STEWART to "hurry up," your affiant believes that CLECKLEY is concerned that SEABROOK will be departing soon and that since CLECKLEY already owes SEABROOK $5,000, CLECKLEY does not have enough capital to provide to SEABROOK for the narcotics that STEWART is attempting to purchase.

94.   At 2217 hours, law enforcement officers observed a Nissan Altima bearing Maryland plate 9DF7119 arrive and park on Prout Street. A male matching STEWART's description exited the vehicle and walked toward the apartment complex. Subsequent record checks revealed the vehicle is registered to Randolph COBEY at 2600 Butterfly Place in Indian Head, Maryland. Your affiant knows that this address is four miles away from 4030 Dunnington Thomas Place in Charles County, Maryland, where STEWART and SIMMONS distribute controlled substances.

95.   At 2217 hours, Target Telephone 1 placed a voice call to (240) 412-1993, a telephone used by William STEWART (Call 29423). The following is a draft transcript of the call between Arsenio CLECKLEY (AS) and William STEWART (WS):

> AC:   Man, hurry up.
>
> WS:   I am, I'm walking down here.... [Inaudible].

96.   Your affiant believes that CLECKLEY is concerned that SEABROOK will depart 2323 Pennsylvania Avenue SE, Apartment 314, Washington, DC 20020 before STEWART can purchase heroin or fentanyl from SEABROOK.

97.   On May 28, 2018 at 2228 hours, Target Telephone 1 received a voice call from (202) 867-2335, a telephone used by UF-2335 (Call 29426). During this call, CLECKLEY can be heard having a background conversation with SEABROOK. After SEABROOK mentions "money," CLECKLEY responds "this is my money right here."



40

98.     Your affiant believes that CLECKLEY and STEWART were paying SEABROOK for controlled substances. When CLECKLEY states "this is my money right here," your affiant believes that this statement not only bolsters the belief that CLECKLEY is paying SEABROOK, but also demonstrates that others present in the apartment are also providing money to SEABROOK for controlled substances. Your affiant believes that this conversation and exchange of money for narcotics occurred inside 2323 Pennsylvania Avenue SE, Apartment 314, Washington, DC 20020.

99.     At approximately 2246 hours, law enforcement officers observed the individual believed to be STEWART enter the Nissan Altima. STEWART was accompanied by CLECKLEY, who were observed talking with one another before the Nissan departed the area.

100.    At 2248 hours, Target Telephone 4 received a voice call from (240) 802-0302, a telephone used by Arsenio CLECKLEY (Call 1585). The following is draft transcript of the call between Anthony SEABROOK (AS), Arsenio CLECKLEY (AC), and Terri BORDEAUX (TB):

AC:     [Background conversations].

AS:     What's going on?

AC:     [Background conversations].

AS:     Hello?

AC:     Hello?

AS:     Yeah, what's wrong?

AC:     Yeah, tell Cece she needs to come downstairs, that dude talking about, that man talking about calling the police, man. She needs to get the dude his money back.

AS:     Oh shit.



41

AC:    Alright, he already talking about calling the poli... Uncle Ricky making shade, he talking about calling the police, bro.

TB:    Who?

AC:    The dude, Uncle Ricky took his money.

TB:    Naw.

AC:    I just told you, I'm about to tell the dude, he pulling back around here to me about he about to call the police, I'm about to tell him pull around here, somebody give that man his money, man.

TB:    [Inaudible].

AC:    Come downstairs, come downstairs man.

TB:    I'm about to give him his coke, [Inaudible]... that's what he want? [Inaudible].

AC:    Yeah.

TB:    [Inaudible].

AC:    Come downstairs, right now...

TB:    Okay, aight.

AC:    He's talking about calling and sending up there, like... Come on Cece, Uncle Ricky doing too much.

TB:    [Inaudible]. Yes he is.

AC:    Man, come on, you need to come down here right now.

TB:    [Inaudible].

AC:    [Inaudible]. I told you.

TB:    I'm coming down the steps.

101.    Your affiant believes that after CLECKLEY walked STEWART to his vehicle, CLECKLEY observed a disgruntled individual who felt that BORDEAUX and "Uncle Ricky" had

42



not engaged in an ethical narcotics transaction. By stating "that man talking about calling the police, man. She needs to get the dude his money back," your affiant believes that the individual was threatening to call the police and CLECKLEY recognized that he did not want law enforcement to come to the area. When BORDEAUX responds, "I'm about to give him his coke, [Inaudible]... that's what he want," your affiant believes that BORDEAUX is trying to remedy the customer service issue by providing the individual with the cocaine that the individual felt he had purchased.

102.    At 2259 hours, Target Telephone 1 received a voice call from (202) 819-4772, a telephone used by UM-4772 (Call 29441). The following is a draft transcript of the call between Arsenio CLECKLEY (AS) and UM-4772 (UM):

AC:    [Inaudible].

UM:    What's up, ho?

AC:    What's up wit'chu.

UM:    Nuttin', I'm trying, Ghost, Ghost about to come see you [Inaudible].

AC:    Alright, I'm, I'm a, everything, I just gave to my little cousin. Everything about to be down, uh, where Billy's at, the club, you know where Billy's at?

UM:    Yeah.

AC:    It's about to be, I'm in DC though, I'm about to leave in a second though, but I gave everything to him to whip it up, or unless you want it un-whip.

UM:    Yeah, I want it, I want [Inaudible]...

AC:    It's drop, I mean, it's, I got both. I'm just saying, uh I'm a get him to do that tonight, so just when I call you, just, uh, I'm a get you, uh, be [Inaudible]... at probably my cousin's house, you probably, you know Devin and them, Devin [Inaudible].[8]

_____

[8] When CLECKLEY says "I'm a get you, uh, be [Inaudible]... at probably my cousin's house, you



43

UM:   Yeah, yeah, yeah.

AC:   Yeah, they're my cousins. But, I'm about to, I gave for them to do
something for me, then, uh, I'm a get you to pull up and I probably
[Inaudible] I'm a get you to pull up at their house.

UM:   Alright, bet.

AC:   Alright, just pick up your phone.

UM:   Alright.

AC:   Alright.

UM:   Alright.

103.   Your affiant believes that CLECKLEY is informing UM-4772 that STEWART
recently procured narcotics from SEABROOK at 2323 Pennsylvania Avenue SE, Apartment 314,
Washington, DC 20020. By stating "everything, I just gave to my little cousin. Everything about
to be down, uh, where Billy's at, the club," your affiant believes that CLECKLEY is informing
UM-4772 that the newly obtained narcotics are en route to a club. When CLECKLEY states "I
gave everything to him to whip it up, or unless you want it un-whip," your affiant believes that
CLECKLEY is referring to the dilution levels of heroin or fentanyl. Your affiant is aware that
"whip it up" and "un-whip" are coded terms for cutting or diluting controlled substances such as
fentanyl or heroin. When CLECKLEY states "I'm a get him to do that tonight," your affiant
believes that CLECKLEY is informing UM-4772 that CLECKLEY will request that STEWART
dilute the heroin or fentanyl.

---

probably, you know Devin and them, Devin," your affiant believes CLECKLEY is referring to
Devin SIMMONS and 4030 Dunnington Thomas Place in Charles County, Maryland.

44

104.   At 2300 hours, Target Telephone 1 placed a voice call to (240) 412-1993, a telephone used by William STEWART (Call 29442). The following is a draft transcript of the call between Arsenio CLECKLEY (AS) and William STEWART (WS):

> AC:   Hey, I want you to try, do all of them up tonight for me [Inaudible].
>
> WS:   Alright.
>
> AC:   [Inaudible]... a hit, I got somebody coming... [Inaudible]... whip it up for me, you know what I'm saying, at least do half of it one time and do the other half the next time. [Inaudible].
>
> WS:   Alright, I got you.
>
> AC:   Just do, just like 4 of them, 4 and a half, 5.
>
> WS:   And do all of them and just hold the other joints.
>
> AC:   And then do the rest, and naw, do the rest, the next one.
>
> WS:   Tomorrow.
>
> WS:   [Inaudible].
>
> AC:   [Inaudible]. I'm about to come down there, I'm going to bring you something too.
>
> WS:   Alright, I'm about to uh, try to see, [Inaudible]... I got to find a place to put this shit together at.
>
> AC:   You ain't got nowhere to put it together?
>
> WS:   [Inaudible]... uh, yeah, naw, I got a couple spots, [Inaudible]... I got to see if they available.
>
> AC:   Go to Brenda's joint.
>
> WS:   I might go, I might fuck with it.
>
> AC:   Go ahead. [Inaudible]... I'm going to be down there in the next 40 minutes. But I'm going to [Inaudible] me some too [Inaudible] bring [Inaudible] 5.



45

WS:   Yeah. Like 5.

AC:   [Inaudible]… hello?

WS:   Huh?

AC:   [Inaudible]

WS:   Yeah, like 5, what is that, 350?

AC:   Huh?

WS:   Yeah, so what's that, like 350, you said 70 a joint.

AC:   Yeah.

WS:   Yeah, that's 350, I added it up.

AC:   Alright.

WS:   Alright.

AC:   Alright.

105.   Your affiant believes that CLECKLEY is instructing STEWART to dilute the heroin or fentanyl that STEWART and CLECKLEY recently procured from SEABROOK. When CLECKLEY states "whip it up for me, you know what I'm saying, at least do half of it one time and do the other half the next time," your affiant believes that CLECKLEY wants the heroin or fentanyl diluted as CLECKLEY had stated, "a hit, I got somebody coming." Your affiant knows that CLECKLEY routinely refers to his purchasers as "hits." Your affiant believes that STEWART confirms this by stating "I got to find a place to put this shit together at." In addition, your affiant believes that STEWART is going to re-sell the diluted heroin or fentanyl to UM-4772 for $70 per unit. When STEWART states "Yeah, so what's that, like 350, you said 70 a joint," your affiant believes that STEWART will be distributing five units at $70 per unit.



46

106.     At approximately 2316 hours, law enforcement officers observed a black male believed to be SEABROOK enter the Mitsubishi Outlander and depart 2323 Pennsylvania Avenue, SE, Washington, DC. The officers discontinued surveillance at this time.

107.     At 2356 hours, Target Telephone 1 placed a voice call to (240) 412-1993, a telephone used by William STEWART (Call 29456). The following is a draft transcript of a selection of the call between Arsenio CLECKLEY (AS) and William STEWART (WS):

> WS:    Where you at?
>
> AC:    I'm at, I'm about to hit Accokeek, I'm about to be at Accokeek, probably like 10 minutes, I'm a meet you at Brenda's joint.

108.     Your affiant believes that CLECKLEY will be meeting STEWART at "Brenda's" in order to sell the heroin or fentanyl.

109.     On May 29, 2018 at 0014 hours, Target Telephone 1 received a voice call from (240) 412-1993, a telephone used by William STEWART (Call 29459). The following is a draft transcript of a selection of the call between Arsenio CLECKLEY (AS) and William STEWART (WS):

> AC:    Naw, I was saying, [Inaudible] I was going to send Doug down there, right, my cousin.
>
> WS:    Yeah.
>
> AC:    My cousin is going to be with Doug. He gonna, he gonna have it, right, my cousin, dude, he going to be with you, he's going to, uh, he going to have that for you, I want you to give him 14 grams for me, and they going to come back and meet me at the bar.
>
> WS:    They going to give you 14 to what, uh, the drop?
>
> AC:    I want, no, I want you to give them 14 to drop, for me.
>
> WS:    Yeah, oh, oh...



47

AC: And, and he going, cuz, bring, they on their way right now, he going, he [Inaudible] 5…

WS: [Inaudible]… just hold the rest for, 'til tomorrow?

AC: Yeah, like I said, just hold it down for me.

WS: Oh, alright.

AC: [Inaudible]… you know what I'm saying… [Inaudible]… but anyway but, and then, uh, they gonna, he bringing the 5 down there, just give him the money for the 5.

WS: Oh, alright, bet, bet, that's a bet.

AC: Alright, be careful with that, that shit too, down there.

WS: Alright, well, whatcha think I should put on 5? 10?

AC: Naw, [Inaudible]… want people come back… [Inaudible]…

WS: 5?

AC: Naw, for real…

WS: Put 5 on 5?

AC: Naw, for real for real, I sell it like it is. I'm gonna keep it 100, sell it, get people in line, cause that's what they want, they gonna chase.

WS: Yeah.

AC: Just tell 'em be careful, give 'em a little bit, and then once you get 'em on your line, then you put that, then you put that, uh, 8 on 5 or something.

WS: Yeah, alright.

AC: [Aside] He said, "look at my man," Doug talking about something, yeah, pick dick right in 'em. Naw

WS: He funny as shit.

AC: [Inaudible]… that's what you do though, you know what I'm saying?

WS: Yeah, I got you.

48

AC:   [Inaudible]… just give 'em that like that… [Inaudible]… you getting' it for 7 anyway, but you know what I'm saying?

WS:   Right.

AC:   So, the first joint, you sell it to 'em, you just sell a G for a buck fifty… you hear me?

WS:   Yeah.

AC:   Buck 50, 75 a half. They gonna bite. They gonna go. Then they be chasing you. They can't get high on nothing. Then you put whatever on it.

WS:   Alright.

AC:   I'm telling you how to do the game, that's how you do the game. But tell 'em, hey, tell 'em, tell 'em, 'be careful,' every time you give something to them [Aside: let me get some bamboo shoots]… you got to say 'be careful,' you hear me?

WS:   Yeah, I got you.

AC:   Gotta be like, be careful, do a little bit and [Inaudible], yeah, you hear me?

WS:   Yeah.

AC:   Or, you could just put, just, an extra 3 on it to be on the safe side

WS:   Yeah, I think I might, I think I might do that [Laughing].

AC:   [Laughing] Just put 3 on it.

WS:   I think I might do that.

AC:   Just put 3 on it, alright?

WS:   Alright, I got you.

AC:   Just put 3, alright?

WS:   Huh?

AC:    Alright, put 3, but they on their way [Aside: I don't want it, I got to go brother, I got to go back up the road] Alright, uh, alright, they on their way down there.

WS:    Alright, [Inaudible].

AC:    Alright.

110.    Your affiant believes that CLECKLEY is instructing STEWART on how to dilute the heroin or fentanyl. Your affiant knows that CLECKLEY has an individual named Doug CANTRELL who tests the potency of CLECKLEY's narcotics. When CLECKLEY states "I was going to send Doug down there," your affiant believes that CLECKLEY is informing STEWART that CANTRELL will meet with STEWART to determine if STEWART is adding the appropriate amount of cutting agents to the heroin or fentanyl. CLECKLEY later states "I want you to give him 14 grams for me," which your affiant believes is an instruction from CLECKLEY to STEWART for STEWART to distribute 14 grams of heroin or fentanyl for CLECKLEY. When CLECKLEY states "be careful with that, that shit too, down there," your affiant believes that CLECKLEY is warning STEWART that heroin and fentanyl are dangerous controlled substances.

111.    When STEWART responds "Alright, well, whatcha think I should put on 5? 10?" your affiant believes that STEWART is asking CLECKLEY whether STEWART should add 5 or 10 grams of a cutting agent—such as benefiber—to the heroin or fentanyl. CLECKLEY responds "Naw, [Inaudible]... want people come back." Your affiant believes that CLECKLEY thinks that amount is too high and that if STEWART over-dilutes the heroin or fentanyl, STEWART will not have repeat purchasers. CLECKLEY then states "Naw, for real for real, I sell it like it is. I'm gonna keep it 100, sell it, get people in line, cause that's what they want, they gonna chase."

112.    Your affiant believes that CLECKLEY is instructing STEWART that if he distributes pure heroin or fentanyl, purchasers will be loyal. CLECKLEY continues by stating

"Just tell 'em be careful, give 'em a little bit, and then once you get 'em on your line, then you put that, then you put that, uh, 8 on 5 or something." Your affiant believes that CLECKLEY is instructing STEWART to initially provide pure heroin or fentanyl to purchasers with a warning, and once the individuals are hooked or "on your line," then STEWART should dilute the heroin or fentanyl with 8 or 5 grams of cutting agent so that he can increase profits. CLECKLEY later states "So, the first joint, you sell it to 'em, you just sell a G for a buck fifty… you hear me?" Your affiant believes that CLECKLEY is instructing STEWART to sell a gram of the pure heroin or fentanyl for $150. CLECKLEY continues, "Buck 50, 75 a half. They gonna bite. They gonna go. Then they be chasing you. They can't get high on nothing. Then you put whatever on it."

113.    Your affiant believes that CLECKLEY is informing STEWART that after the purchasers have tried the pure heroin or fentanyl, STEWART will have a loyal customer base and can dilute the heroin or fentanyl with any amount of cutting agent. When CLECKLEY states "extra 3 on it to be on the safe side," your affiant believes that STEWART and CLECKLEY ultimately agree to dilute the heroin or fentanyl with 3 grams of cutting agent per unit of distribution.

114.    As referenced above, during this event, law enforcement officers were conducting surveillance on Prout Street in Washington, DC. Law enforcement officers also observed the **MAZDA MPV** bearing Virginia tag UYM8830 parked on Prout Street. During intercepted calls, CLECKLEY arranged for an unknown male to come to Washington, DC to perform maintenance on the vehicle. Law enforcement officers then observed the unknown male and other individuals working on the **MAZDA MPV** bearing Virginia tag UYM8830. On numerous occasions throughout the evening, CLECKLEY and other individuals accessed the **MAZDA MPV** bearing Virginia tag UYM8830.

115.    On May 30, 2018, at 0020 hours, Target Telephone 1 received a text message from (917) 975-1037, a telephone used by Anthony SEABROOK (Call 29789). The message read, "Thank u we have 2 go over some of contract c later be safe."

116.    On May 30, 2018, at 0030 hours, Target Telephone 1 placed a voice call to (917) 975-1037, a telephone used by Anthony SEABROOK (Call 29797). During this call, SEABROOK told CLECKLEY, "That's an even tre right there, man." CLECKLEY replied, "That's what I said." SEABROOK said, "Oh, Okay, Okay, Okay, Alright... We gotta go over the other contracts, okay no problem at all." Your affiant believes that the "contracts" in Calls 29789 and 29797 are references to ongoing drug pricing agreements between CLECKLEY and SEABROOK. Your affiant further believes that the reference "tre" means three or $3,000 that CLECKLEY just paid SEABROOK.

117.    On May 30, 2018, at approximately 0729 hours, a law enforcement officer conducted surveillance at 177 Hamburg Street in Baltimore, Maryland. This was a known residence of SEABROOK. The law enforcement officer observed the Mitsubishi Outlander that SEABROOK was recently observed driving parked on Hamburg Street. Your affiant believes that SEABROOK was operating the Mitsubishi Outlander on May 29, 2018 and traveled from Maryland to 2323 Pennsylvania Avenue SE, Apartment 314, Washington, DC to distribute over 250 grams of fentanyl or heroin to CLECKLEY and STEWART.

118.    On May 30, 2018, at 2004 hours, Target Telephone 1 placed a voice call to (917) 975-1037, a telephone used by Anthony SEABROOK (Call 30248). During this call, CLECKLEY was intercepted speaking to an unidentified third party while waiting for SEABROOK to answer his phone. CLECKLEY told the unidentified male that "It's gonna be today. It's gonna be tonight, because he's gonna call me tonight." CLECKLEY later said, "I'll just put your two ounces aside...



That's what you want?" The unidentified male replied, "Yeah." Your affiant believes that CLECKLEY was taking an order for narcotics from a redistributor in person while simultaneously attempting to reach his source of supply.

119.    A short time later, at 2057 hours, Target Telephone 1 received a text message from to (917) 975-1037, a telephone used by Anthony SEABROOK (Call 30267), which read, "In N Y." At 2103 hours, Target Telephone 1 received a text message from (917) 975-1037, a telephone used by Anthony SEABROOK (Call 30271), which read, "I got another three brandnew gucci offits." Your affiant believes that the references to "three brandnew gucci offits" is a coded reference to the fact that SEABROOK had just obtained narcotics.

120.    On May 30, 2018, investigators observed CLECKLEY's van—the **MAZDA MPV** bearing Virginia UYM8830 parked at the Colony South Hotel, 7401 Surratts Road, Clinton, Maryland. Intercepted calls revealed that CLECKLEY was distributing narcotics from the hotel.

121.    On May 31, 2018, at 1441 hours, Target Telephone 1 received a voice call from (917) 975-1037, a telephone used by Anthony SEABROOK (Call 30537). During this call, CLECKLEY asked, "Ain't Shit. Later on could you meet me at [unintelligible] at, uh… at, uh… ." SEABROOK replied, "Shit, it's gon' be a storm. I was tryin' to see what was happenin' wit' you now, might gotta come… " CLECKLEY later said, "I need you to holla at grandma for me, and my Garage Boy is tryin' to get three of 'em." SEABROOK asked about CLECKLEY's whereabouts and CLECKLEY replied, "I'm, uh… mm, I'm 'bout to, uh… nah, I ain't at Cece. I'm up, I'm at the, by the Harbor." CLECKLEY continued, "[Unintelligible] you could meet me at the Harbor. I got my room. I got my room over here." SEABROOK later said, "I gotta go, uh… see my dude real quick and get this paperwork from, for this house thing and when I leave from there… he's off of New York Avenue. I'm a head straight to you. I'll come to you at the Harbor."



53

CLECKLEY answered, "Aight, I told you your [unintelligible], your Garage Boy tryin' to look at them houses, too." Surveillance, which had been established at the Hampton Inn in the National Harbor, observed CLECKLEY driving the **MAZDA MPV** bearing Virginia registration tag UYM8830 in the area of the Hampton Inn.

122.    Your affiant believes that these calls are references to the fact that CLECKLEY and SEABROOK are planning to meet in order for CLECKLEY to be resupplied by SEABROOK and that CLECKLEY is referencing the fact that he is obtaining narcotics in order to supply "the Garage Boys." Your affiant knows that the "Garage Boys" is a reference to SIMMONS and STEWART.

123.    On May 31, 2018, at 1759 hours, Target Telephone 1 received a voice call from (917) 975-1037, a telephone used by Anthony SEABROOK (Call 30595). During this call, CLECKLEY directed SEABROOK to the Hampton Inn "across the street from the Gaylord." CLECKLEY said he would send the address to SEABROOK.

124.    On May 31, 2018, at 1801 hours, Target Telephone 1 sent a text message to (917) 975-1037, a telephone used by Anthony SEABROOK (Call 30597), which read, "250 waterfront st national habor md." At 1815 hours, Target Telephone 1 received an incoming call from (917) 975-1037, a telephone used by Anthony SEABROOK (Call 30609). During this call, SEABROOK and CLECKLEY confirmed that they were meeting at the Hampton. SEABROOK directed CLECKLEY to come to the front of the building because SEABROOK had his son with him. CLECKLEY agreed to come down to meet SEABROOK.

125.    On May 31, 2018, law enforcement officers conducted surveillance at the Hampton Inn & Suites National Harbor located at 250 Waterfont Street, Oxon Hill, Maryland 20745. At 1834 hours, law enforcement officers observed the Mitsubishi Outlander parked in front of the



hotel. Law enforcement officers observed CLECKLEY walk from the hotel and enter the front passenger seat of SEABROOK's Mitsubishi Outlander. Approximately two minutes later, CLECKLEY exited the vehicle and returned to the hotel.

126.    On May 31, 2018, at 1937 hours, Target Telephone 1 placed an outgoing text message to (917) 975-1037, a telephone used by Anthony SEABROOK (Call 30641), which read, "I got 45." On May 31, 2018, at 1937 hours, Target Telephone 1 received an incoming call from (917) 975-1037, a telephone used by Anthony SEABROOK (Call 30641). During this call, CLECKLEY and SEABROOK discussed meeting, but SEABROOK complained about the weather. CLECKLEY and SEABROOK then agreed to meet later that night or in the morning. Your affiant believes that SEABROOK met with CLECKLEY to provide CLECKLEY with controlled substances.

127.    On May 31, 2017, the Baltimore Police Department and Emergency Medical Services responded to **177 WEST HAMBURG STREET, BALTIMORE, MARYLAND 21230** after a call to 911 for medical assistance. Anthony SEABROOK—who was found unconscious at 177 West Hamburg Street—was transported to University Hospital where he was pronounced dead.

128.    On June 11, 2018, the Honorable United States Magistrate Judge Gina Simms issued arrest warrants for Arsenio CLECKLEY and eight other conspirators, including BORDEAUX, STEWART, and SIMMONS. On June 12, 2018, agents from Homeland Security Investigations, along with members of the Prince George's County Police Department, the Drug Enforcement Administration, and the Charles County Sheriff's Office executed those warrants.

129.    While search CLECKLEY's residence at 15924 Dusty Lane, Accokeek, Maryland, investigators observed CLECKLEY'S **MAZDA MPV** bearing Virginia registration tag

UYM8830 parked in the driveway of the residence. Based on surveillance, investigators knew this vehicle was used by Arsenio CLECKLEY to transport and distribute controlled dangerous substances. During the investigation, CLECKLEY was observed on numerous occasions as the operator of the vehicle or a passenger. The **MAZDA MPV** was towed to a law enforcement evidence bay located in the District of Maryland for processing.

## CONCLUSION

130.    Based on the foregoing, there is probable cause to believe that the target locations will contain evidence of conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); use of communication facilities to facilitate the commission of such offenses, in violation of Title 21, United States Code, Section 843(b); simple possession of a controlled substance, in violation of Title 21, United States Code, Section 844; felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g); use of a firearm in furtherance of a drug trafficking offense, in violation of Title 18, United States Code, Section 924(c); and conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h) ("Target Offenses").

131.    In addition to controlled substances, your affiant believes that **177 WEST HAMBURG STREET, BALTIMORE, MARYLAND 21230** will contain documents, travel records, telephones, and other evidence of drug trafficking and money laundering. Your affiant knows that cell phones and communications devices—including the cell phone SEABROOK used to commit the drug trafficking and money laundering offenses described in this affidavit—retain electronic data indefinitely. Your affiant also knows that those engaged in financial crimes such

as money laundering often retain electronic and paper copies of records and communications relevant to the illicit financial transactions in their residences.

132.    For the reasons stated in this affidavit, your affiant requests the issuance of the requested warrants.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Special Agent Aaron Klein
Homeland Security Investigations

Subscribed and sworn before me this __22__ day of June, 2018.

Judge Thomas M. DiGirolamo
United States Magistrate Judge

57

### ATTACHMENT A
### Items to be seized

(A)  Heroin, fentanyl, Cocaine, Cocaine base, also known as "crack" Cocaine, marijuana, MDMA, and any other illegal controlled substances, as well as any materials or items used for the preparation of illegal controlled substances;

(B)  Books, records, receipts, notes, ledgers, and other papers including any computerized or electronic records, relating to the transportation, ordering, purchasing and distribution of controlled substances;

(C)  Address and/or telephone books, papers, paging devices and their contents, and cellular telephones and their contents reflecting names, addresses and/or telephone numbers, including computerized or electronic address and/or telephone records;

(D)  Books, records, receipts, bank statements and record money drafts, letters of credit, money orders and cashier's checks, receipts, passbooks, bank checks, safety deposit keys, and any other items evidencing the obtaining, secreting, transfer, and/or concealment of assets in the obtaining, secreting, transfer, concealment and/or expending or money;

(E)  United States currency, precious metals, jewelry and financial instruments, including but not limited to stocks and bonds;

(F)  Photographs, in particular, photographs of co-conspirators, of assets, and/or of controlled substances, and other documents identifying associates and co-conspirators;

(G)  Indicia of occupancy, residence and/or ownership of the target locations, including but not limited to, utility and telephone bills, canceled envelopes and keys;

(H)  Indicia of travel, including but not limited to, passport, visas, airline tickets, boarding passes, and airline receipts;

(I)  Safes: combinations or lock-type, and their contents;

(J)  Cellular telephones, SIM cards, tablets, laptops, thumb drives, and all other electronic devices which could contain evidence of (i) the nature, extent and methods of operation of the Target Offenses in which the above-named individuals participated; (ii) the identities, roles, and telephone numbers of the conspirators, accomplices, aiders and abettors, and other participants in the Target Offenses; (iii) the existence and location of records of the Target Offenses; (iv) the existence and location of any other items or means used in furtherance of the Target Offenses; and (v) the dates and times for the commission of the aforementioned Target

Offenses. This warrant shall authorize the forensic search of such electronic devices.

(K)     Firearms, ammunition, silencing devices, destructive devices, magazines, firearm accessories and equipment related to the use or maintenance of firearms, any other weapons which could be used to further the Target Offenses, and documents related to the ownership or registration of such firearms or firearm accessories.

59

## ATTACHMENT B-1
## Description of 177 WEST HAMBURG STREET, BALTIMORE, MARYLAND 21230

**177 WEST HAMBURG STREET, BALTIMORE, MARYLAND 21230** is a multi-level brick row house. The number "177" is written on a green door pm W. Hamburg Street, Baltimore. The door is in between two four-paned windows with white trim. A black fence surrounds the front of the property.





60

## ATTACHMENT B-2

The **MAZDA MPV** to be searched is a 1996 silver and black MAZDA MPV van bearing

Virginia tag UMY8830 and Vehicle Identification Number JM3LV522XT0811763 located in a

law enforcement evidence bay in the District of Maryland.